***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Jones and the briefs and arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence or to amend the prior Opinion and Award except for the modifications made herein. The Full Commission therefore affirms the Opinion and Award of the Deputy Commissioner with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner and in a Pre-Trial Agreement as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. At all relevant times, an employment relationship existed between plaintiff and defendant-employer.
3. RSKCO Insurance Company is the carrier on risk.
4. Plaintiff's average weekly wage was sufficient to justify a weekly compensation rate of $620.00, the maximum compensation rate for the year of injury.
5. Plaintiff's medical records were stipulated into evidence as Stipulated Exhibit 1.
6. Industrial Commission forms and filings relating to this case, as well as wage information and discovery responses, were stipulated into evidence as Stipulated Exhibit 2.
7. The issues before the Full Commission are: (i) whether plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer on July 20, 2001; (ii) whether plaintiff contracted an occupational disease arising out of and in the course of his employment with defendant-employer; and (iii) if so, what compensation, if any, is due plaintiff.
 *********** EVIDENTIARY RULINGS
The objections raised in both depositions of David A. Esposito, M.D., are OVERRULED.
 ***********
Based upon all the competent evidence of record and the reasonable inferences flowing therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 56 years old and had a high school education. Plaintiff spent the bulk of his working life, at least since 1969, working in the motion picture industry. He first began as a laborer and worked up through the ranks to directing. His primary role for the past few years has been as a cameraman.
2. On July 20, 2001, plaintiff was employed by defendant-employer primarily as a cameraman but also as director of photography for a Showtime Entertainment project entitled "Going to California." Robert Aldridge worked as assistant cameraman on this particular project, which involved working 12 hours a day for 5 to 6 days a week. Plaintiff used a hand-held camera that rested on his shoulder and was controlled by the rotation of his shoulders and arms. The camera weighed approximately 30 to 45 pounds. Plaintiff assumed various positions in order to assure a good shot.
3. Throughout filming, the camera was held in many different configurations to ensure a good shot. Positioning of the camera often required positions and movements similar to that of a contortionist. Often, plaintiff was required to hold the camera above his head, underneath his body, or while he hanged upside down. The camera is controlled with the rotation of the shoulders rather than the arms to ensure it is steady. The arm is used to balance the camera during the rotation with the left arm generally extended out to grip the pistol grip and secure and hold in place the lens portion of the camera.
4. Prior to July 23, 2001, plaintiff noted some tightness and stiffness in his shoulder, but attributed it to fatigue and assumed it would pass. On July 23, 2001, after a full morning of filming, plaintiff was packing his equipment when he reached across his body with his left arm to pick up his camera from the floor. As he was coming up with the camera, he had a sudden onset of pain in his left arm. The pain was piercing at first, but then eased off a bit and plaintiff continued working that day. This was corroborated by the testimony of Robert Alan Aldridge. Plaintiff described the pain as first being a stabbing pain, which then turned to numbness.
5. The crew was short staffed during the filming of "Going to California" and both plaintiff and Aldridge had additional duties and long hours. Plaintiff first presented for medical treatment to his primary physician, Dr. Jackson, on July 30, 2001. At that time, he complained of left shoulder pain and gave a history of utilizing his left shoulder a "bit too much these past few weeks shooting a movie." He was sent for a shoulder x-ray at that time. Dr. Jackson provided plaintiff with Percocet and Mobic and scheduled an MRI of the left shoulder, which was performed on August 29, 2001. After receiving the MRI results, Dr. Jackson scheduled an appointment for plaintiff with Dr. Esposito on September 13, 2001. At that time, Dr. Jackson's diagnosis was distal supraspinatus tendonosis.
6. Plaintiff remained out of work at that time. His first appointment with Dr. Esposito was on October 12, 2001. At that time, Dr. Esposito noted plaintiff to be tender over the front part of his shoulder, which is usually indicative of some rotator cuff type injuries. At that time, Dr. Esposito felt plaintiff would benefit from arthroscopic surgery. He further indicated that he would have plaintiff on a light-duty job with no use of the left arm if that were available.
7. Plaintiff was next seen on December 3, 2001, by Dr. Esposito's physician's assistant, Kern L. Barrow. Mr. Barrow's pre-operative notes reflected a history of a "professional cinematographer with a several month history of progressively severe left shoulder stiffness with overhead activity, i.e. reaching and pulling." On December 6, 2001, Dr. Esposito performed arthroscopic on plaintiff at Wilmington Surgcare. Dr. Esposito testified that plaintiff had a tear of the labrum, which is an under-surface rotator cuff tear. He cleaned up the tear, removed a spur, and took off the end of the collarbone. Plaintiff was also noted to have synovitis, which is inflammation of the lining of the joint. Plaintiff was kept out of work because of his injury.
8. On January 29, 2002, plaintiff was continuing to have problems and underwent manipulation under anesthesia. This is a procedure in which the physician moves the joint to break the scar tissue. He also inserted a Novocaine pump to help with the pain. Dr. Esposito again saw plaintiff on May 31, 2002. At that time, Dr. Esposito suggested a functional capacity evaluation (FCE) to set final work restrictions. Plaintiff was unable to pay for this procedure, and it had not been performed until the Full Commission ordered it to be performed at the expense of defendants
9. Plaintiff has made efforts to find work that will not involve use of his left shoulder, but has been unsuccessful. His only experience is in the motion picture industry and in recent years it has been as a cameraman. He has applied for a job as a professor, but did not have the Masters Degree required. Plaintiff attempted to get his captain's license with the hopes of trying to earn a living charting boats. He does not feel that he can return to camera work, but does feel he could do directing; however, has not been offered any jobs directing, which he attributes to his primary experience as a camera operator rather than a director. Plaintiff did earn about $1,600.00 working as a stand-in actor, but has had no other income.
10. Dr. Esposito opined, and the Full Commission finds as fact, that the lifting incident when plaintiff picked up the camera was the "straw that broke the camel's back." Dr. Esposito's explanation was that the lifting incident was the acute event on top of a chronic condition brought about by plaintiff's use of his upper body and extremities while operating a heavy movie camera. He testified that the overhead activity predisposed plaintiff to, and placed him at a greater risk of, rotator cuff problems and shoulder problems than the population in general. Both the synovitis and the rotator cuff tear were the result of the lifting of the camera at the time plaintiff felt the intense pain.
11. The following colloquy between counsel for plaintiff and Dr. Espisoto during deposition is instructive:
 Q. Now, if he'd been working as a camera operator for quite some time, and in the past he had been doing it a lot, and he put the camera — He used the camera up on his shoulder and had a lot of overhead lifting, and so forth, repetitive type motion, is that something that could have also caused this, or is this more of a specific event?
 A. Oh, this sounded like a one time event; however, the two are related. * * * overhead activity does predispose to rotator cuff problems and shoulder problems.
 Q. And this is certainly something that could have caused it?
A. Sure.
Q. Either one?
 A. It could have been acute on the chronic — In other words — or a progressive thing that was going on, and this was kind of the final straw that broke the camel's back.
12. Plaintiff has been unable to work as a cameraman by reason of his compensable occupational disease and his surgical procedures since July 23, 2001. His functional capacity examination shows he is no longer capable of handling heavy movie cameras. Defendant-employer has not offered plaintiff any work within his limitations. Among the findings of the FCE conducted by Healthsouth in Wilmington were the following:
 The results of this evaluation indicate that Frank Flynn did not display the ability to perform the physical demands of the job of Camera Operator. According to the Dictionary of Occupational Titles, the occupation of Camera Operator requires a medium strength demand. Mr. Flynn is presently lifting in the sedentary category of work with occasional floor to knuckle lift of 10 lbs.
13. Plaintiff may benefit from retraining. Accordingly, plaintiff should present himself to State Vocational Rehabilitation for assessment and counseling. Should State Vocational Rehabilitation and plaintiff agree upon a course of retraining, defendants shall pay for same as part of their obligation pursuant to N.C. Gen. Stat. §§ 97-25 and 97-2(19).
14. Although Dr. Esposito has found plaintiff to be at maximum medical improvement after his Healthsouth FCE of August 5, 2003, defendants have produced no evidence to rebut the presumption that plaintiff's disability continues, since the FCE determined that plaintiff could not return to his regular job and that he was only capable of work at the sedentary to light category.
 ***********
Based upon the foregoing findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff developed a rotator cuff tear and further medical complications due to causes and conditions characteristic of and peculiar to his employment with defendant-employer. This rotator cuff tear and further medical complications is not an ordinary disease of life to which the general public not so employed is equally exposed, and is, therefore, an occupational disease. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff, as a result of his development of a compensable occupational disease, is entitled to temporary total disability compensation at a rate of $620.00 per week. This compensation shall continue until further order of the Commission. N.C. Gen. Stat. § 97-29. "After a finding of maximum medical improvement, the burden remains with the employer to produce sufficient evidence to rebut the continuing presumption of disability; the burden does not shift to the employee." Brown v. S NCommunications, Inc., 124 N.C. App. 330, 477 S.E.2d 197 (1996).
3. Plaintiff is entitled to all medical treatment that would effectuate a cure, give relief, or lessen plaintiff's period of disability as a result of his development of a compensable occupation disease. Defendants are to pay for all such care, both past and future. N.C. Gen. Stat. § 97-25, as limited by N.C. Gen. Stat. § 97-25.1.
4. Plaintiff is entitled to reasonable vocational rehabilitation, which shall be provided by defendants. Foster v.U.S. Airways, Inc., 149 N.C. App. 913, 563 S.E.2d 235 (2002), discretionary review denied, 356 N.C. 299, 570 S.E.2d 505 (2002). N.C. Gen. Stat. §§ 97-25 and 97-2(19).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to an attorney fee set forth below, defendants shall pay to plaintiff total disability compensation at a rate of $620.00 a week beginning July 23, 2001, and continuing until further order from this Commission. The portion of this compensation that has accrued to the filing date of this Opinion and Award shall be paid in a lump sum.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of his compensable development of an occupational disease, including the surgeries performed by Dr. Esposito. Defendants shall continue to pay all medical expenses reasonably designed to effectuate a cure, give relief, or lessen plaintiff's period of disability
3. A reasonable attorney's fee of twenty-five percent (25%) of compensation due plaintiff under Paragraph 1 of this AWARD is approved for plaintiff's counsel. Defendants shall pay such fee as follows: twenty-five percent (25%) of the lump sum due plaintiff under Paragraph 1 of this AWARD shall be deducted from that sum and paid directly to plaintiff's counsel by defendants. In regards to future compensation, defendants shall pay directly to plaintiff's counsel the equivalent of every fourth check.
4. Plaintiff shall present himself to State Vocational Rehabilitation for assessment and counseling. Should State Vocational Rehabilitation and plaintiff agree upon a course of retraining, defendants shall pay for the same as part of their obligation pursuant to N.C. Gen. Stat. §§ 97-25 and 97-2(19).
5. Defendants shall pay the costs.
This 23rd day of April 2004.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER